## A06A0211. GOLDBERG v. THE STATE.
### (634 SE2d 419)

MIKELL, Judge.

Michael Saul Goldberg appeals from the denial of his motion for new trial following his conviction of burglary, arguing that the trial court erred by (1) denying his *Batson*[1] motion, (2) refusing to charge the jury on theft by taking, and (3) sentencing him under the general recidivist statute, OCGA § 17-10-7 (a), instead of the more specific burglary statute, OCGA § 16-7-1 (b). We affirm.

1. Goldberg first assigns error to the denial of his *Batson* motion to reseat African-American jurors struck by the state, arguing that the trial court erred in ruling that he failed to establish a prima facie case of racial discrimination.

> The evaluation of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.[2]

"The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. The trial court's findings as to whether the opponent of the strike has met the burden of persuasion are entitled to great deference and will be affirmed unless clearly erroneous."[3]

The *Batson* challenger makes out a prima facie case of racial discrimination by showing that "the totality of the relevant facts

---

[1] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[2] (Citation omitted.) *Flanders v. State*, 279 Ga. 35, 37 (2) (609 SE2d 346) (2005).

[3] (Citations and punctuation omitted.) *Rakestrau v. State*, 278 Ga. 872, 874 (3) (608 SE2d 216) (2005).

gives rise to an inference of discriminatory purpose."[4] But "numbers alone may not establish a disproportionate exercise of strikes sufficient to raise a prima facie inference that the strikes were exercised with discriminatory intent."[5] Here, the record shows that the state used five of its six permitted peremptory strikes. Four of the five potential jurors stricken, or eighty percent, were African-American.[6] However, the record also shows that the percentage of African-Americans on the jury actually seated was higher than that of the qualified panel. Of the thirty-five potential jurors who comprised the qualified panel, twenty-one were white, twelve were African-American, and two were categorized as "other." Thus, the panel was 60 percent white and 34 percent African-American, while the jury was 41 percent African-American. Moreover, the alternate was an African-American female, raising the percentage of African-Americans on the jury to 46 percent. Considering that the ratio of African-American jurors to white jurors exceeded the ratio of potential African-American jurors to potential white jurors, the trial court did not err in ruling that Goldberg had not made out a prima facie showing of racial discrimination in jury selection.[7] Therefore, we affirm the trial court's ruling on the *Batson* issue, and this enumeration of error is without merit.

Although we affirm the trial court on this issue, and the trial court's ruling on the issue was correct, we alert the bench and bar that analysis of a *Batson* challenge is usually a three-step process. It is not advantageous for a trial judge to omit any of the three steps. Although the standard of review of a trial court's ruling at step one, the prima facie case, is abuse of discretion, and in theory the trial court's rulings at this stage are entitled to deference, in many cases, as in the matter at bar, the issue depends on arithmetic. In an important case, there will be appellate review by our court and others, and possibly review by state and federal courts deciding a petition for a writ of habeas corpus. If any of those many courts are not enamored of the trial court's mathematics, the case will have to be tried again. It is true that a challenge on appeal to the validity of a prima facie case may be precluded "once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the

---

[4] (Citations and punctuation omitted.) *Whatley v. State*, 266 Ga. 568, 570 (3) (468 SE2d 751) (1996).

[5] (Citations omitted.) *Livingston v. State*, 271 Ga. 714, 718 (2) (524 SE2d 222) (1999).

[6] Compare *Rakestrau*, supra at 874-875 (3) (prima facie case of racial discrimination made where state used all of its peremptory strikes against African-Americans).

[7] *King v. State*, 224 Ga. App. 400, 401 (2) (480 SE2d 385) (1997). See also *Jones v. State*, 246 Ga. App. 596-597 (1) (539 SE2d 602) (2000) (jury contained a larger proportion of African-Americans than did the venire); *Livingston*, supra (same).

ultimate question of intentional discrimination."[8] A ruling on the ultimate issue of intentional discrimination is step three of the usual *Batson* analysis. A trial court's ruling at that stage is subject to review on an abuse of discretion standard, and a trial judge's rulings at that stage are entitled to great deference. By contrast, if a trial court ceases its inquiry after step two, the proffering of allegedly race-neutral reasons, its conclusions are entitled to no deference. There are numerous appellate decisions ruling as a matter of law that proffered explanations were or were not race-neutral. Therefore, in practice, appellate review after a step two ruling is de novo. As explained in *Gay v. State*,[9] "[o]ur review of [rulings at] stage two is analogous to our [rulings on motions for] summary judgment[ ] or to our former [rulings on] demurrers in common law."[10] A trial court's ruling at stage three is dependent on a wide variety of factors, including the demeanor of the jurors during voir dire and indeed the demeanor of the lawyers as they offer their explanations. We must give, and we have given, great deference to the rulings of the trial court at stage three. The better practice, whenever a party in a criminal or a civil case, raises a *Batson* challenge to a peremptory strike, is for the trial court to complete all three steps of the traditional *Batson* analysis.

2. Goldberg next argues that the trial court erred in refusing to charge the jury on theft by taking as a lesser included offense of burglary.

Burglary is committed when a person "without authority and with the intent to commit a felony or theft therein, . . . enters or remains within . . . any other building . . . or any part thereof."[11] Theft by taking is committed by "unlawfully tak[ing] or, being in lawful possession thereof, unlawfully appropriat[ing] any property of another with the intention of depriving him of the property."[12] "Theft by taking may be, but is not always, a lesser included offense of burglary."[13]

Bearing in mind the definitions of the two offenses, we review the transcript to determine whether any evidence was presented from which a jury could infer that Goldberg committed the offense of theft by taking.

---

[8] (Citation and punctuation omitted.) *Lingo v. State*, 263 Ga. 664, 670 (1), n. 6 (437 SE2d 463) (1993) (Sears, J., dissenting), citing *Hernandez v. New York*, 500 U. S. 352, 359 (II) (A) (111 SC 1859, 114 LE2d 395) (1991).

[9] 258 Ga. App. 634 (574 SE2d 861) (2002).

[10] Id. at 635 (1), n. 3.

[11] OCGA § 16-7-1 (a).

[12] OCGA § 16-8-2.

[13] *Carter v. State*, 238 Ga. App. 632, 635 (2) (519 SE2d 717) (1999).

The evidence adduced at trial shows that an alarm sounded inside Quality Kosher Emporium, a kosher food market located in a strip shopping center at the intersection of Briarcliff and Lavista Roads in Atlanta, at approximately 10:45 p.m. on the night following the conclusion of Yom Kippur on September 16, 2002.[14] Steve Gilmer, the owner of the store, testified that he received a call from the company that monitors his security system notifying him that one of his outside freezers had been breached. Gilmer further testified that the freezer in question is secured by a padlock and a burglar bar, so that the only way for someone without a key to enter the freezer would be to break the lock. The lock, which was introduced into evidence, had been broken.

The security company dispatched the police. DeKalb County Police Officer Harry Stiles arrived at the market at 11:10 p.m. Stiles testified that he drove up to the back of the market, where the freezer was located, and observed Goldberg walking out of the freezer carrying a box. Stiles also observed a blue Bronco backed up to the freezer. After determining that Goldberg was not an employee of the market, Stiles placed him in his patrol car and began investigating. Stiles testified that when he looked in the Bronco, he saw six boxes similar to the one Goldberg had been carrying as well as a hammer. Gilmer arrived at the scene at 11:30 p.m. and identified the products in the boxes as his property.

On that same night, Goldberg gave conflicting statements to Detective L. A. Sims. First, at the scene, Goldberg told Sims that an unknown male had dropped him off and told him to go in the freezer and get some meat for a party. Goldberg did not explain why his vehicle was at the scene. Later, at the police station, Goldberg stated that a guy named "Al" told him to go there.[15]

Goldberg testified that he was cutting through the parking lot of the shopping center when he saw three boxes sitting on the ground toward the back of the market. He stated that he placed the boxes in the back of his vehicle. Goldberg testified that he had no purpose for picking up the boxes other than curiosity.

Goldberg then testified that every statement he made to Sims and Stiles was "absolutely" a lie. The prosecutor asked him why he lied to Stiles, and Goldberg replied:

---

[14] Jewish holidays begin at sundown and end at nightfall the following day.

[15] An audiotape of Goldberg's second statement to Sims was played for the jury but has not been included in the record on appeal.

A. Well, if you put yourself in my shoe[s] and a police officer pulled behind there and there I have . . . three boxes in my vehicle that come off the ground which I stated to him I picked up off that ground, you know, what else do you say?

Q. So you lied.

A. I sure did.

When asked whether he was stealing the boxes he put in his vehicle, Goldberg testified: "Like I told the officer, I didn't think it was against the law to pick up a box out of a parking lot." The prosecutor repeated the question, and Goldberg continued, "that's why I stood there and waited for him to do his job." Goldberg repeatedly denied entering the freezer. He also denied that he opened the boxes or that he was aware of what was inside of them.

"The complete rule with regard to giving a defendant's requested charge on a lesser included offense is: where the state's evidence establishes all of the elements of an offense *and there is no evidence raising the lesser offense*, there is no error in failing to give a charge on the lesser offense."[16] Conversely, "[w]here a case contains some evidence, no matter how slight, that shows that the defendant committed a lesser offense, then the court should charge the jury on that offense."[17]

Goldberg claims that an inference can be drawn from his testimony that he intended to steal the boxes, thus warranting a charge on theft by taking. Goldberg relies on *Anglin v. State*,[18] in support of his contention. In *Anglin*, the defendant claimed that he saw two unknown men standing near a store with a large accumulation of merchandise and that the men fled when they saw him.[19] The defendant testified that he decided to take some of the merchandise and was caught in the act of stealing it. Thus, he "admitted his presence at the scene and an intent to steal goods that he admitted were not his."[20] Although the evidence was deemed sufficient to support his burglary conviction, the conviction was nevertheless reversed because the judge refused to charge theft by taking as a lesser included offense.[21] We noted in the opinion that the judge offered no reason for refusing to give the charge.[22]

---

[16] (Citation omitted; emphasis in original.) *Edwards v. State*, 264 Ga. 131, 133 (442 SE2d 444) (1994). Accord *Moore v. State*, 265 Ga. App. 511, 513 (2) (594 SE2d 734) (2004).

[17] *Edwards*, supra.

[18] 182 Ga. App. 635 (356 SE2d 564) (1987).

[19] Id. at 636 (2).

[20] Id. at 637 (2).

[21] Id.

[22] Id.

In the instant case, the trial court explained that it relied on *McNeese v. State*[23] in denying Goldberg's motion for new trial on this issue. In *McNeese*, a security guard discovered the defendant inside a closed mill carrying bags of socks. The mill's back door had been torn down, and the security chain was dislodged.[24] The defendant testified that he found the socks sitting by the fence near the railroad tracks, and so he took them. He denied breaking into the mill. The defendant "never indicated that he thought the socks were the 'property of another,' nor did he admit to having the requisite intent to steal. OCGA § 16-8-2."[25] We reasoned that the defendant's testimony established "that he was merely gathering abandoned property, which is not a crime."[26] Thus, we affirmed the court's refusal to give his requested charge on theft by taking.[27]

We believe that the trial court correctly relied on *McNeese* in determining that the elements of theft by taking could not be inferred from Goldberg's testimony. Even under withering cross-examination, Goldberg denied an intent to steal the boxes. Rather, he did not believe he had broken any laws when he put the boxes in his vehicle, which is why he waited for the officer "to do his job." Goldberg's testimony established "that he was merely gathering abandoned property, which is not a crime."[28]

Finally, even if Goldberg's testimony that he lied to the police permits an inference that he knew he was taking "property of another" within the meaning of OCGA § 16-8-2, any error in failing to give his requested instruction on theft by taking is harmless because the evidence that he committed burglary is overwhelming.[29] As recounted above, the state's evidence showed that the police caught Goldberg inside the freezer holding merchandise belonging to Gilmer. The only way to enter the freezer without a key, which Goldberg did not have, was to break the lock. A hammer was found on the front seat of Goldberg's vehicle, as were six boxes of Gilmer's products. The freezer's padlock was found on the ground, broken. The evidence was overwhelming that Goldberg "without authority and with the intent to commit a felony or theft therein, . . . enter[ed] or remain[ed]

---

[23] 186 Ga. App. 410 (367 SE2d 235) (1988).

[24] Id. at 410 (1).

[25] Id. at 411 (2).

[26] (Citation omitted.) Id.

[27] Id.

[28] (Citation omitted.) Id.

[29] See *Edwards*, supra (failure to charge lesser offense harmless where evidence of greater offense is overwhelming). Accord *Braley v. State*, 276 Ga. 47, 53 (30) (572 SE2d 583) (2002) (same); *Damare v. State*, 257 Ga. App. 508, 510 (2) (571 SE2d 507) (2002) (same).

within . . . any other building . . . or any part thereof."[30] Therefore, we will not reverse his conviction for failure to give the requested charge.

3. Finally, Goldberg argues that the trial court erred in sentencing him under the general recidivist statute, OCGA § 17-10-7 (a), instead of the more specific burglary statute, OCGA § 16-7-1 (b). We disagree.

At the sentencing hearing, the state introduced certified copies of Goldberg's four prior felony convictions: a 1988 conviction of burglary, theft by receiving, and habitual violator; a 1992 conviction of theft by taking; a 1998 conviction of forgery in the first degree and theft by receiving; and a 2001 conviction of burglary. As this was his fifth conviction, the trial court sentenced Goldberg under OCGA § 17-10-7 (a) and (c) to twenty years to serve ten. The court was correct.

Under OCGA § 17-10-7 (a), a repeat felony offender "shall be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she stands convicted, provided that . . . the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense." OCGA § 17-10-7 (c) provides that a fourth-time felon must "serve the maximum time provided in the sentence of the judge . . . and shall not be eligible for parole until the maximum sentence has been served."

Goldberg contends that the trial court should have sentenced him under OCGA § 16-7-1 (b), which prescribes a sentence of "imprisonment for not less than five nor more than 20 years" for a third conviction of burglary. However, this Court has made it clear that a defendant who has multiple prior convictions in addition to burglary convictions is properly sentenced under OCGA § 17-10-7.

> The record here shows that [Goldberg] had been convicted of not only two previous burglaries, but three other felonies as well. Thus he was, for sentencing purposes, more than a mere three-time burglary offender under the specific recidivist provisions of OCGA § 16-7-1 (b). He was a [five]-time felony offender under the general recidivist provisions of OCGA § 17-10-7 (a) [and (c)]. . . . The existence of prior felony convictions in addition to those for burglary removes the case from the exclusive provisions of OCGA § 16-7-1 (b) and allows for the application of the repeat offender statute for sentencing purposes.[31]

---

[30] OCGA § 16-7-1 (a).

[31] (Punctuation omitted.) *State v. Chambers*, 275 Ga. App. 666, 667 (621 SE2d 588) (2005), citing *Stephens v. State*, 259 Ga. App. 564, 565 (578 SE2d 179) (2003). Compare *Norwood v. State*, 249 Ga. App. 507, 508-509 (2) (548 SE2d 478) (2001) (where only prior felony conviction

The trial court properly sentenced Goldberg as a recidivist under OCGA § 17-10-7 (a) and (c).

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED JUNE 20, 2006 —
RECONSIDERATION DENIED JULY 25, 2006 — ▬▬▬▬

*Gerard B. Kleinrock*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Barbara B. Conroy, Assistant District Attorney*, for appellee.

---

used to enhance defendant's sentence was one for burglary, trial court erred in utilizing general recidivist statute).